aEE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAULA S. CANTLEBERRY, Plaintiff, | ) | Case No. 07 C 5695 |
| v. | ) | |
| PHYSICIAN CARE, LTD. and ALEXANDER NICHOLS, Defendants. | ) | Magistrate Judge Arlander Keys |

**MEMORANDUM OPINION AND ORDER**

Paula Cantleberry sued her former employer, Physician Care, Ltd., and her former supervisor, Dr. Alexander Nichols, alleging that Dr. Nichols sexually harassed her and then fired her for complaining about the harassment; she also alleged a claim of intentional infliction of emotional distress against Dr. Nichols. Ms. Cantleberry's case was tried to a jury, and, on September 17, 2008, the jury returned a verdict in her favor on all three claims. The jury awarded Ms. Cantleberry $43,750 in compensatory damages and $41,875 in punitive damages; the jury also determined that Ms. Cantleberry was entitled to backpay, though the parties had stipulated prior to trial that the Court would set the actual amount of that award. In a subsequent decision, dated December 18, 2008, the Court awarded backpay in the amount of $59,067.00, plus prejudgment interest on that award in the amount of $8,891.55; the Court also granted Ms. Cantleberry's motion for attorneys' fees and costs, awarding $59,636.00 on the former and

$1,049.36 on the latter. Judgment to this effect was entered on December 18, 2008.

On April 8, 2009, an amended judgment was entered, apportioning liability against the two separate defendants; judgment was entered against Physician Care in the amount of $117,958.55, and against Dr. Nichols in the amount of $35,625.00. The Court assessed the fee award - $68,941.76 - against both defendants, and also awarded Ms. Cantleberry an additional $8,256.40 in attorneys' fees for work performed in connection with post-trial proceedings. Thus, the total award against both defendants was $222,525.31; to date, Ms. Cantleberry has been unable to collect on the judgment.

While Ms. Cantleberry's case was proceeding, Dr. Nichols was also in the midst of a bitter divorce battle. At some point, he fled to Egypt, taking one of his minor children with him and leaving his ex-wife high and dry. Because of this, the court in the divorce action appointed a Receiver to manage and liquidate Dr. Nichols' assets so that his obligations in the divorce proceedings could be met. To that end, on February 27, 2009, Arlington Group Ltd., Edgar Vargas, M.D., S.C., and Physician Care Ltd., acting through the court appointed Receiver, entered into an Asset Purchase Agreement. *See* Plaintiff's Memorandum of Law in Support of Successor Liability, Exhibit A. Pursuant to that agreement, Arlington Group Ltd. purchased from Physician

Care (represented by the Receiver) assets related to the medical practice located at 1925 East Rand Road in Arlington Heights, Illinois. *Id.*, p. 1. The agreement specifically stated that neither Arlington Group, nor Dr. Vargas, "is assuming any liabilities or obligations which arise from or are connected with the operation of the Business Assets or Practice Assets prior to Closing." *Id.*, ¶3.1. The agreement was signed by George S. Feiwell, the court appointed Receiver in the Nichols' divorce action, by Thomas Kanzler, president of Arlington Group, and by Edgar Vargas, president of Edgar A. Vargas, M.D., S.C. *Id.*, p. 10.

Ms. Cantleberry now asks the Court to hold Arlington Group and Dr. Vargas liable for the judgment entered against Physician Care; she argues that, under Federal Rule of Civil Procedure 25(c), they are liable as successors in interest. Initially, the Court notes that, although there is no evidence that the parties to the Asset Purchase Agreement were acting in bad faith or acting in any way to aide or abet Dr. Nichols in his efforts to evade his legal responsibilities, the purchasers were not strangers to Dr. Nichols. The president of Arlington Group, Thomas Kanzler, was a long-time patient of Dr. Nichols who enjoyed with him a "friendly doctor-patient relationship," *see* Kanzler Dep., p. 7; and Dr. Vargas had a professional relationship with both Dr. Nichols and Physician Care. But is

that enough to hold them liable for the sexual harassment judgment obtained by Ms. Cantleberry?

Federal Rule of Civil Procedure 25(c) provides that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." In the employment discrimination context, successor liability may exist where (1) the successor company had notice of the charge or pending lawsuit prior to acquiring the business or assets of the predecessor; (2) the predecessor is unable to pay on the judgment; and (3) the successor has substantially continued the business operations of the predecessor. *Dybala v. Landau & Heyman, Inc.*, No. 94 C 7719, 1997 WL 162846, at *3 (N.D. Ill. March 27, 1997)(citing *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir. 1986)).

It seems clear that Physicians Care, the assets of which have all been sold or liquidated and transferred to Nina Nichols, is unable to pay on the judgment. But the remaining factors are disputed. First, it is not entirely clear that there has been "a sufficient continuity in the business operations of the predecessor and successor" as required under the law. *See Wheeler*, 794 F.2d at 1236. Arlington Medical Group operates out of the same building as Physician Care, and there are at least two people who had some involvement with Physician Care who now

have some involvement with Arlington Group - namely, Dr. Vargas and Christ Koulis, who was a friend and possibly a business associate of Dr. Nichols' and who helped to broker the deal with Arlington Group. And, given Dr. Vargas' involvement with both practices, it would seem that Arlington has continued to offer gastroenterology services.

On the other hand, Dr. Vargas testified that Dr. Nichols was really into anti-aging medical procedures and that Arlington Group is not offering anything like that. Vargas Dep., Exhibit 157-6, p. 17. And Mr. Kanzler testified that the equipment he purchased from Physician Care was outdated and had to be replaced and upgraded. Exhibit 157-3, pp. 14-15.

Nor is it clear that the successor company had actual notice of the charge or pending lawsuit prior to purchasing Physician Care. Mr. Kanzler testified that Dr. Nichols had told him, during the course of one of his visits, that he had been sued by one of the nurses who worked for him. See Kanzler Dep., Exhibit 157-3, p. 6. He also testified that he learned of the "problem" "way before" he started to close the deal to purchase the practice. *Id.*, p. 8. But Mr. Kanzler also testified that he "didn't even know there was a lawsuit. I just knew that there was not that nurse working there, and he had mentioned that he had had some problem with her." *Id.* He testified that "it was just a brief conversation. We didn't talk more than, hey,

where's the blonde girl or the red-headed girl or whatever girl that was missing, and he said I'm having some problem with her, okay? That was it." *Id.*, p. 9. He testified that he first learned there was an actual lawsuit when he was served with the citation to discover assets - long after the purchase agreement was executed.

There is some evidence to suggest that Dr. Vargas may have known about the Cantleberry lawsuit prior to the execution of the Asset Purchase Agreement. Dr. Vargas testified that "they probably told me that he had some problems, but I didn't - I didn't know the details. I didn't know any information, nothing like that." Vargas Dep., Exhibit 157-6, p. 8. He testified that he "heard that she [Paula Cantleberry] was suing him [Dr. Nichols] for sexual harassment or something like that." *Id.*, p. 9. When asked when he heard this, he testified "[p]robably was in the process of the selling situation, when the papers was doing things. And then suddenly I found that my name was involved in this." *Id.* He testified that it was probably in November or December of 2008," *id.*, which would have been a few months prior to the execution of the Asset Purchase Agreement.

But the Court finds that, under the circumstances, this is not enough to justify imposing successor liability on the parties to the Asset Purchase Agreement. First, it is undisputed that Mr. Kanzler was the real purchaser of Physician Care; although

the agreement transferred to Dr. Vargas the predecessor practice's files and goodwill, he paid nothing under the agreement, while Mr. Kanzler paid the entire purchase price. Thus, Mr. Kanzler's knowledge (or lack thereof) would control the issue to a greater extent than would Dr. Vargas' knowledge.

Moreover, the question is not whether successor liability may be imposed in this general context, but whether it should be imposed in the circumstances of this particular case. *See Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985)(each successor liability case must be determined on its own facts) (citing *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091 (6th Cir. 1974))). Here, the Court is persuaded that, under the circumstances, neither Arlington Group nor Edgar Vargas, M.D., S.C., should be liable for the judgment obtained by Ms. Cantleberry. As the court explained in *Wheeler*, the successor's knowledge of the claim is crucial to the decision to impose liability because, if the successor knows about the claim, he then has an opportunity to protect himself by, for example, writing provisions into the acquisition agreement that will shield him from liability. Here, the Asset Purchase Agreement contains such a clause.

Perhaps most importantly, although this Court would like to see Ms. Cantleberry collect on her judgment against Dr. Nichols and his practice, it would be woefully unfair to allow her to

drag Arlington Group and Dr. Vargas into this action at this time. Not only did they purchase the assets under circumstances that should rightfully have given them legal comfort - the deal was negotiated with and executed by a court-appointed Receiver, and the predecessor was purchased pursuant to an agreement containing a provision expressly limiting the assumption of liabilities - but they had no opportunity to participate in the action that led to the judgment, no ability to contest any of the rulings, and no chance to prevent Dr. Nichols from absconding in the face of his legal obligations.

**CONCLUSION**

For the reasons explained above, Ms. Cantleberry's Motion for Joinder or Substitution of Parties [#155] is denied.

Dated: February 23, 2011

ENTER:

ARLANDER KEYS
United States Magistrate Judge